## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 0:18-cv-63144-RAR

**OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA, DEPARTMENT OF
LEGAL AFFAIRS,**

      Plaintiff,

                -vs-

**MOVING AND STORAGE
ACCOUNTING INC**, et al.,

      Defendants.

_____

### PLAINTIFF'S MOTION FOR DEFAULT FINAL JUDGMENT AS TO LIABILITY AND ORDER FOR PERMANENT INJUNCTION AND OTHER RELIEF AS TO DEFENDANT MAXX J. SOCHER AND CORPORATE DEFENDANTS MOVING SERVICES ACCOUNTING AND STORAGE INC, AND DR. SCHLEPPER INC

COMES NOW, Plaintiff, Office of the Attorney General, State of Florida, Department of Legal Affairs ("Office of the Attorney General" or "Plaintiff"), pursuant to the Court's Order of July 30, 2019 [ECF No. 37] and Rule 55(b)(2) of the Federal Rules of Civil Procedure, and submits Plaintiff's Motion For Default Final Judgment as to Liability and Order For Permanent Injunction and Other Relief as to Defendant Maxx J. Socher ("Socher") and Corporate Defendants Moving Services Accounting and Storage Inc ("MSAS"), and Dr. Schlepper Inc ("Schlepper").

Plaintiff respectfully requests that the Court enter Plaintiffs' proposed Default Final Judgment (**Exhibit A**) against Defendants MSAS, Schlepper and Socher ("Default Defendants") who were properly served but have failed to respond to Plaintiff's Complaint, and were entered in default.[1]  The proposed Default Final Judgment contains findings that the Default Defendants violated certain federal and state statutes set forth in Plaintiff's Complaint, and permanently

---

[1]     Default Defendant Socher is not in the military and is otherwise sui juris.  (See Department of Defense Manpower Data Center Status Report attached as **Exhibit B**).

enjoins Default Defendants from committing any further such violations.  The proposed Default Final Judgment also provides that the Court will retain jurisdiction to determine, among other things, the amount by which the Default Defendants shall be ordered to pay, jointly and severally, equitable restitution, civil penalties and/or attorney's fees and costs.  Plaintiff intends to file an appropriate motion seeking such a monetary judgment once the issue concerning the liability of (non-defaulting) co-defendant Grace Metzger ("Metzger") and her related entities, (defaulting) Defendants Moving and Storage Accounting Inc ("MSA Inc"), and Moving and Storage Accounting Services Inc ("MSA Services") has been is resolved.

## I.    INTRODUCTION AND BACKGROUND

Plaintiff initiated this action by filing its Complaint [ECF No. 1] against four Corporate Defendants (MSA Inc, MSA Services, MSAS and Schlepper) and two Individual Defendants (Socher and Metzger), seeking injunctive relief, equitable restitution, civil penalties and other statutory relief.  The action was brought by Plaintiff pursuant to:

(1) Section 14711 of Title 49 U.S.C., Subtitle IV, Part B ("Interstate Transportation Code" or "I.T.C."), based on Defendants' violations of the consumer protection provisions of that Title, and including the regulations promulgated thereunder by the Federal Motor Carrier Safety Administration ("FMCSA") contained in Title 49 C.F.R., Chapter III, Subchapter B, Sections 350-399 ("FMCSA Regulations"); and

(2) the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes ("FDUTPA"), based on direct violations of Section 501.204(1) of FDUTPA and indirect FDUTPA violations arising from Defendants' violations of the Florida Household Moving Services Act, Chapter 507, Sections 507.01-507.13, Florida Statutes ("Florida Moving Act"), the I.T.C. and FMCSA Regulations, which constitute per se violations of FDUTPA.

On February 1, 2019, Defendant Metzger filed a Motion to Dismiss Complaint [ECF No. 6], which was subsequently denied by the Court on May 1, 2019. [ECF No. 18].  Thereafter, Defendant Metzger timely filed her Answer to the Complaint.  [ECF No. 28].

On April 1, 2019, the Court entered an Order to Show Cause Regarding Service of Process [ECF No. 9] relating to several of the Defendants, including Default Defendants, MSAS, Schlepper and Socher.  On April 12, 2019, Plaintiff filed a timely response thereto [ECF No. 17], and also filed the Affidavits of Service regarding the Default Defendants [ECF No. 14, 15, 16].  Despite having been properly served, the Default Defendants failed to answer or otherwise plead to Plaintiffs' Complaint.  Accordingly, the Clerk of the Court entered a Clerk's Default against Default Defendants, MSAS, Schlepper and Socher on May 8, 2019 [ECF No. 22].[2]

Because Defendants MSAS, Schlepper and Socher failed to file a response to the Complaint, which the Clerk has noted by entering defaults against them [Id.], the well-pled allegations of fact in the Complaint are deemed admitted.  *See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) (holding that a "defendant, by his default, admits the plaintiff's well-pleaded allegations of fact").  Thus, the Default Defendants have conceded that they are liable for violations of the I.T.C., FMCSA Regulations and FDUTPA as alleged in each Count set forth in the Complaint.  [See ECF No. 1, ¶¶ 99-172].

On May 30, 2019, the Court entered an Order on Default Final Judgment Procedure [ECF No. 26], noting that:

> "Upon review of the record, it appears that the following Defendants have indeed failed to respond to the Complaint or otherwise appear in this action: (1) [MSA Inc]; (2) [MSA Services]; (3) [MSAS]; (4) [Socher]; and (5) [Schlepper]…."

The Court's Order directed Plaintiff to file either:  (1) a Motion for Default Final Judgment, if there was only one Defendant or multiple Defendants but no allegations of joint and several liability and no possibility of inconsistent liability between Defendants; or (2) a Notice of Joint

---

[2]     Co-defendants MSA Inc, and MSA Services also failed to answer or otherwise plead to Plaintiffs' Complaint after having been served, and a Clerk's Default was entered against them on April 11, 2019 [ECF No. 13].

Liability, if there were multiple Defendants and allegations of joint and several liability, or the possibility of inconsistent liability between Defendants.

On June 13, 2019, Plaintiff timely filed its Notice of Joint Liability [ECF No. 27], asserting that entry of a Default Final Judgment imposing injunctive relief against Default Defendants, MSAS, Schlepper and Socher, is appropriate at this time, based on their own independent violations of law.  Plaintiff also argued, however, that the amount of Default  Defendants' joint and several liable (for equitable restitution, civil penalties and attorney's fees and costs) could not yet be determined (without creating the potential risk for incongruous or logically inconsistent results) until the liability of their (non-defaulting) co-defendant (Metzger) and her related entities (Defendants MSA Inc and MSA Services) was ultimately resolved. [Id.].

On July 30, 2019, the Court entered an Order Requiring Plaintiff to File a Motion Establishing Entitlement to Injunctive Relief, concerning Default Defendants, MSAS, Schlepper and Socher.  [ECF No. 37].

## II.    THE COURT SHOULD ENTER THE PROPOSED DEFAULT FINAL JUDGMENT AND ORDER FOR PERMANENT INJUNCTION AGAINST DEFAULT DEFENDANTS MSAS, SCHLEPPER AND SOCHER

Default judgment is warranted when the well-pled factual allegations of the complaint, which are deemed to be admitted by the defaulting party, provide a sufficient legal basis for its entry. [3]  The standard for entering a default judgment is the same as that for overcoming a motion to dismiss—i.e., "the complaint must contain sufficient factual matter, accepted as true, to state a

---

[3]      By defaulting, a defendant "admits the plaintiff's well-pleaded allegations of fact, and is barred from contesting on appeal the facts thus established." *Eagle Hosp. Physicians, LLC*, 561 F.3d at 1307 (quoting *Nishimatsu Const. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.1975)); *Buchanan v. Bowman*, 820 F.2d 359 (11th Cir. 1987) ("liability is well-pled in the complaint, and is therefore established by the entry of default").

claim to relief that is plausible on its face." [4] Here, Plaintiff's Complaint contains ample factual allegations to establish the liability of Default Defendants, MSAS, Schlepper and Socher, for violations of the I.T.C., FMCSA Regulations and FDUTPA as alleged therein.

Specifically, the Complaint alleges that from at least January 2014 to at least in or about May 2016, the Default Defendants advertised themselves as being professional movers staffed by well-trained employees who use the utmost care with shippers' belongings and are scrupulous in preparing and following estimates. [ECF No. 1, at ¶1]. In fact, however, the Complaint alleges they regularly used unskilled, untrained laborers who often damaged or stole property, and routinely provided deceptive, low ball estimates then extorted higher fees by holding shippers' property hostage. [*Id*.].

The Complaint further alleges that Default Defendant Socher (along with co-defendant Metzger) controlled the acts and practices of the Corporate Defendants (MSA Inc, MSA Services, MSAS and Schlepper); they operated the Corporate Defendants as part of a common enterprise and exercised control over all their financial accounts. [*Id*., at ¶¶4, 43-44, 93]. Socher was the only registered officer of Default Defendants MSAS and Schlepper [*Id*., at ¶¶27, 28], while Defendant Metzger served as the president of Defendants MSA Inc and MSA Services. [*Id.*, at ¶33].

The Complaint further alleges that the Default Defendants utilized unfair and deceptive trade practices in connection with advertising, soliciting, providing, offering, selling or distributing services relating to the moving, transportation, arranging for the transportation or the physical movement and/or storage of household goods ("Moving Services") for consumers residing in Florida and elsewhere throughout the United States. [*Id*., at ¶5-12]. Additionally, the Complaint

---

[4]     *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). This "plausibility" standard does not require "detailed factual allegations"—rather, all that is required is "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

detailed the numerous deceptive acts and practices that were engaged in by the Default Defendants, including making false and/or misleading representations and promises (expressly and by implication) on their website that:

1. Defendants' moving company (Full Service Van Lines) had been engaged in the moving industry for the past "27 years," when, in fact, it had not, and the oldest entity within Defendants' Enterprise was only formed in about September 2011; [*Id.*, at ¶70a];

2. Defendants' team was made up of "highly trained,  professionals and experts" with over a decade of experience in the moving industry, when in fact, they often utilized untrained, unskilled and improperly supervised laborers to perform the household goods moving services; [*Id.*, at ¶¶1, 11, 69, 70b, d, e, 73, 75, 79, 101, 145b,e];

3. Defendants had a nationwide team of movers ("spread across the country") and therefore could deliver the consumers' property across long distances "…in excellent condition and without any damage," when in fact, they had no control over any such "team," but rather often used other, third-party carriers whose employees were not trained or supervised by the Defendants, and who often carelessly damaged or failed to deliver the consumers' property; [*Id.*, at ¶¶ 1, 11, 69, 70c, e, 73, 76-80, 91c, 101, 145e,f,g];

4. Defendants had a nationwide team of movers and therefore could deliver the consumers' property across long distances "within the specified time period," when in fact, the they did not control such a nationwide team, and therefore they often unloaded and stored the consumers' goods at an undisclosed storage facility until the goods could be combined with the household goods of other consumers who were moving to the same geographic region or vicinity, thereby resulting in substantial delivery delays or loss to consumers; [*Id.*, at ¶¶ 70c, 74, 89, 91h, 127, 167g, 168f];

5. Defendants utilized "professional loading and unloading methods" to ensure that products would be delivered "perfect condition without any scratches or damages," when in fact, they and their unskilled laborers often acted in a careless or reckless manner that resulted in substantial, unrecompensed damage to (or loss of) consumers' household goods;  [*Id.*, at 1, 11, 68, 69, 70a, b, e, f, j, 72i, 73, 75, 76, 101, 145b, e];

6. Defendants were "fully insured" and "licensed" movers, which they implied meant that they met "the quality standards set by the government," when in fact, they continued operating as a motor carrier even after their operating authority had been revoked by the United States Department of Transportation ("USDOT"); [*Id.*, at ¶¶ 24, 29, 44, 70a, f, 79, 94, 97]; and

7. Defendants repeatedly touted that their moving services were provided with integrity, reliability and trustworthiness as evidenced by the supposed lack of consumer complaints or negative feedback posted on their website, while failing to disclose that the Defendants had offered to pay some customers to remove unfavorable online reviews or to post favorable ones, and in other instances, caused Enterprise affiliates to

post fake online reviews or make favorable comments about them on several websites; [*Id.*, at ¶¶ 1, 68, 70-72].

The Complaint also describes additional deceptive acts and practices by the Default Defendants, which included providing consumers with artificially low moving quotes then dramatically increasing the price after the consumers' goods were loaded.  [*Id.*, at ¶¶1, 6, 8, 9, 81-90].   In numerous instances, the Default Defendants and their agents continued to hold the consumers' household goods "hostage" until the increased price demanded was paid.  [*Id.*, at ¶¶1, 10, 91b, 145d].

Likewise, the Default Defendants and their agents often misrepresented or deceptively represented the timeframe or schedule for pickup, delivery and/or storage of the household goods estimated.   In numerous instances, their agents arrived late to pick up the consumers' goods or delivered those goods well beyond (sometimes many weeks beyond) the promised delivery dates, with insufficient notice and little or no recompense provided to the consumer. [Id., at ¶¶12, 83g, 89, 91e-i, 125-127].

Thus, Plaintiff's Complaint contains ample factual allegations to establish the liability of Default Defendants, MSAS, Schlepper and Socher, for violating the specific provisions of state and federal law set forth in each Count therein.

A.  **The Well-Pled Complaint Establishes that Default Defendants Are Jointly and Severally Liable as Participants in a Common Enterprise.**

Plaintiff's Complaint alleges that Defendant Socher operated Default Defendants, MSAS and Schlepper, as part of a "common enterprise" (the "Enterprise"), while engaging in the unlawful and deceptive acts and practices describe therein.  [*Id.*, at ¶¶4, 41-45].  As such, Default Defendants MSAS and Schlepper are jointly and severally liable for all of the acts and practices of the common

enterprise, as alleged in the complaint.  [*Id.*, at ¶45]. [5]  Likewise, pursuant to I.T.C., Sections 13907

and 14911, each corporate defendant is liable for any violative acts and omissions committed by

any of their officers, directors, agents or employees; when acting in the scope of their employment,

the actions and omissions of individuals acting for or employed by that carrier are considered to

be the actions and omissions of that carrier as well as that individual.  [Complaint, at ¶59].

To determine whether a common enterprise exists, courts look to a variety of factors,

including:  common control; the sharing of office space and officers; whether business is transacted

through a maze of interrelated companies; the commingling of corporate funds; the failure to

maintain separation of companies; the sharing of advertising and marketing; and evidence which

reveals that no real distinction exists between the corporate defendants. [6]

Here, the Complaint alleges Defendant Socher operated the Enterprise through an

interrelated network of companies (including MSAS and Schlepper) with common or overlapping

owners, officers, employees, business functions, marketing activities and office and warehouse

locations.  [Complaint, at ¶ 42].  These entities used the same business model, provided the same

purported services to consumers, commingled funds and shared other resources such as office

space, corporate systems, mailing addresses, employees, advertising and marketing methods and

materials. [*Id.*].  The Corporate Defendants essentially existed for the single purpose of arranging

---

[5]      Corporate defendants are jointly and severally liable when, considering "the pattern and framework of the whole enterprise," there is evidence of a common enterprise between them.  *See Del. Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964); *see also CFTC v. Wall Street Underground*, 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003), *citing Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1175 (1st Cir. 1973) ("Where one or more corporate entities operate in a common enterprise, each may be held liable for the deceptive acts and practices of the other").

[6]      *See FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012) (citing cases); *FTC v. Wolf*, No. 94-8119, 1996 U.S. Dist. LEXIS 1760, *22-23 (S.D. Fla. Jan. 31, 1996); *Nat'l Urological Group, LLC*, 645 F. Supp. 2d at 1182; *FTC v. US. Oil & Gas Corp.*, 1987 U.S. Dist. LEXIS 16137, *58-63 (S.D. Fla. July 10, 1987); *FTC v. Direct Benefits Group, LLC*, 2013 U.S. Dist. LEXIS 100593, *55-56 (M.D. Fla. July 18, 2013).

and selling the Enterprise's Moving Services to consumers, they were created by Defendants Socher and/or Metzger using substantially similar names, and they were operated and promoted to the public using the same fictitious name, i.e., "Full Service Van Lines." [*Id.*, at ¶43].

Thus, Defendants MSAS and Schlepper, as part of a common enterprise, are each jointly and severally liable for the acts and practices of the Enterprise alleged in the Complaint.

**B.  The Well-Pled Complaint Establishes that Default Defendants Violated the I.T.C. and FMCSA Regulations (Counts 1-6)**

As detailed above [*supra,* pages 5-8], the Complaint alleges facts establishing that the Default Defendants violated certain provisions of the I.T.C. and FMCSA Regulations set forth in Counts 1-6 of the Complaint.  Accordingly, the Court should enter the proposed Default Final Judgment containing findings that Default Defendants violated those specified provisions, and retaining jurisdiction to determine the amount of civil penalties to be imposed.

**1.  Count 1:  Advertising Violations by Household Goods Motor Carrier (Section 375.207 of the FMCSA Regulations)**

Section 375.207 of the Regulations permits a household goods motor carrier to publish and use advertisements, but requires that any such advertisements be "truthful, straightforward, and honest."  As detailed above [supra, at pages 6-7], the Default Defendants, while operating as household goods motor carriers, engaged in advertising that was false, dishonest and misleading. For example, the Default Defendants falsely advertised on their website that their company had operated in the moving industry "for the past 27 years," when, in fact, they operated as a licensed motor carrier for no more than 3 years, before being ordered out of operation by the USDOT.  [*Id.*, at ¶¶23-24, 28-29, 70a].  Likewise, the Default Defendants misrepresented that their Moving Services were performed by "highly trained", "professional", or "expert" movers, when in fact, in numerous instances their services were performed (if at all) by unskilled and untrained laborers

who damaged, destroyed or stole the consumers' property. [*Id.*, at ¶¶1, 11, 69, 70b-e, 73, 75-80, 101, 145b,e-g].

### 2. Count 2: Failure to Provide Proper Written Estimates (I.T.C. Section 14104(b) and Section 375.401 of the FMCSA Regulations)

Section 14104(b)(1)(C) of the I.T.C., and Section 375.401 of the Regulations require a household goods motor carrier, before executing an order for shipment of household goods, to provide the shipper with a written estimate of the total charges for the transportation and all related services.  In numerous instances, the Default Defendants and their agents, did not provide proper estimates to shippers, in that the estimates: (a) were not made in a writing that was dated, signed by the Default Defendants' agents and the individual shipper, and copied and supplied to the individual shipper; (b) did not include the total amount for all charges for the transportation and related (accessorial) services to be provided; and (c) were not made based on a physical survey of the household goods to be transported and without having a valid exemption therefrom.  [*Id.*, at ¶¶1, 7, 81-83, 107, 168b].

### 3. Count 3: Failure to Relinquish Goods on Binding Estimate (I.T.C. Section 13707(b)(3) and Sections 375.403(7) and 375.703(a) of the FMCSA Regulations)

Section 13707(b)(3) of the I.T.C. and Sections 375.403(7) and 375.703(a) of the Regulations require a household goods motor carrier to relinquish possession of a shipment of household goods upon the individual shipper's offer to pay the binding estimate amount (plus charges for any additional services requested by the shipper after the bill of lading has been issued and charges, if applicable, for "impracticable operations" not to exceed 15 percent of all other charges due at delivery).  In numerous instances, the Default Defendants failed to relinquish possession of a shipment of household goods to an individual shipper who offered to pay (and in some instances had paid) the binding estimate amount plus applicable charges for additional

services requested by the shipper after the bill of lading has been issued and applicable charges for "impracticable operations" totaling up to 15 percent of all other charges due at delivery.  [*Id.*, at ¶¶6, 8-10, 83-91, 112, 168d].

### 4.  Count 4:  Failure to Relinquish Goods on Non-binding Estimate (I.T.C. Section 13707(b)(3) and Sections 375.405(8), 375.407(a) and 375.703(b) of the FMCSA Regulations)

Section 13707(b)(3) of the I.T.C. and Sections 375.405(8), 375.407(a) and 375.703(b) of the Regulations require a household goods motor carrier to relinquish possession of a shipment of household goods upon the individual shipper's offer to pay 110 percent of the non-binding estimate amount (plus charges for any additional services requested by the shipper after the bill of lading has been issued and charges, if applicable, for "impracticable operations" not to exceed 15 percent of all other charges due at delivery).  In numerous instances, the Default Defendants failed to relinquish possession of a shipment of household goods to an individual shipper who offered to pay (and in some instances had paid) 110 percent of the non-binding estimate amount plus applicable charges for additional services requested by the shipper after the bill of lading has been issued and applicable charges for "impracticable operations" totaling up to 15 percent of all other charges due at delivery. [*Id.*, at ¶¶6, 8-10, 83-91, 120, 168d].

### 5.  Count 5:  Failure to Pick Up/Tender Shipment and Provide Notification (Sections 375.603 and 375.605 of the FMCSA Regulations)

Sections 375.603 and 375.605 of the Regulations requires that a household goods motor carrier tender a shipment for delivery for an individual consumer on the agreed delivery date or within the period specified on the bill of lading, and when unable to so perform, as soon as the delay becomes apparent, the carrier must notify the individual shipper of the delay.  In numerous instances, the Default Defendants, while operating as household goods motor carriers, have failed to pick up and/or tender a shipment of household goods for delivery for an individual consumer

on the agreed delivery date or within the period specified on the bill of lading or order for service. [*Id.*, at ¶¶12, 89, 91e-g, 125-126, 145h, I, 168e].  In many instances, the Default Defendants failed to promptly notify the individual shipper as soon as the delay had become apparent, and/or advise the individual shipper of the dates or periods when they expected to be able to pick up and/or deliver the shipment.  [*Id.*, at ¶¶12, 89, 91h, 127, 168f].

### 6.  Count 6:  Operating as a Carrier or Broker Without Proper Registration (I.T.C. Sections 13901(a) and 13902(a)(6))

Section 13901(a) of the I.T.C., provides that "[a] person may provide transportation as a motor carrier … or … service as a broker for transportation subject to jurisdiction under subchapter I of such chapter only if the person is registered under this chapter to provide such transportation or service."   Section 13902(a)(6) further provides that "[a] motor carrier may not broker transportation services unless the motor carrier has registered as a broker under this chapter."

During all times material to the Complaints, the Default Defendants were never properly registered as a moving broker. [*Id.*, at ¶132].  In addition, Default Defendant Schlepper's registration with the USDOT as a motor carrier was revoked from on or about June 1, 2015 until July 20, 2015; it also received an Order To Cease All Transportation in Interstate and Intrastate Commerce and Revocation of Registration, effective October 5, 2015, which registration was never reinstated by the USDOT. [*Id.*, at ¶29].

Nevertheless, in numerous instances, during the periods from about June 1, 2015 to July 20, 2015 and from about October 5, 2015 to about February 2016, the Default Defendants, operated as household goods motor carriers and provided transportation of household goods subject to jurisdiction under subchapter I of chapter 135 of the I.T.C., or broker services for such transportation to consumers in Florida and elsewhere without being properly registered as a motor carrier or broker under chapter 139 of the I.T.C. [*Id.*, ¶¶29-31, 44, 95-97, 132-136].

**C.  Injunctive Relief Against Default Defendants is Appropriate as the Well-Pled
Complaint Establishes Their Direct and Indirect Violations of FDUTPA**

The purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Section 501.202(2), Florida Statutes. Pursuant to Section 501.207(1)(b), Florida Statutes, the Attorney General is authorized to bring "An action to enjoin any person who has violated, is violating, or is otherwise likely to violate, this part." Further, the Attorney General is entitled to seek equitable relief in the form of restitution, in addition to ancillary equitable relief, civil penalties and attorney's fees pursuant to Sections 501.207, 501.2075, and 501.2077, Florida Statutes.

Permanent injunctive relief is appropriate when "the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *FTC v. Lalonde*, 545 Fed. App'x. 825, 841 (11th Cir. 2013). To that end, "reasonable restrictions upon the future activities of any defendant to impede her or him from engaging in or establishing the same type of endeavor" are permitted by the Act.  Section 501.207(3), Florida Statutes.

As set forth in the Complaint, Default Defendants' enterprise continued to operate as a motor carrier (using rental trucks) even after the USDOT had ordered them "out of service" and stripped the Defendants of their registration and operating licenses. [*See* Complaint, at ¶¶24, 29-31, 44, 95-97, 132-136].  The Complaint specifically alleges that Defendant Socher continued to use the Enterprise's bank accounts to received funds from consumers and pay operating expenses relating to Moving Services that were offer, sold and/or provided to consumers by the Enterprise after the Defendants' operating authority as a carrier had been revoked by the USDOT.  [Id., at ¶96].  Such flagrant, unlawful and deceptive acts and practices by the Default Defendants, which

13

could easily be repeated by them at any time unless enjoined, would likely cause further irreparable injury and prejudice the public

for which there is no adequate remedy at law. [*Id.*, at 97-98, 146-149, 158-159, 160-170].

**1.  Default Defendants' Direct FDUTPA Violation (Count 7).**

Section 501.204(1) of FDUTPA declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." [7]  The Florida Legislature has expressed its intent that, "in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission ["FTC"] and the federal courts relating to Section 5(a)(1) [Unfair and Deceptive Trade Practices] of the Federal Trade Commission Act, …."  Section 501.204(2), Florida Statutes. [8]

A deceptive act or practice occurs under FDUTPA where there is a "representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." [9]   An unfair practice is one in which the injury to the consumer (1) is substantial; (2) is not outweighed by any countervailing benefits to consumers or competition

---

[7]  Trade or commerce is defined under FDUTPA as "the advertising, soliciting, providing, offering, or distributing" of any good or service by any person. Section 501.203(8), Florida Statutes.  Advertising or soliciting consumers to purchase Moving Services is not an exempt activity under FDUTPA.  *See* Section 501.212, Florida Statutes, which lists activities exempt from FDUTPA, and does not include advertising for Moving Services.

[8]  *See also, Millennium Communs. & Fulfillment, Inc. v. Office of the Attorney General, Department of Legal Affairs*, 761 So. 2d 1256, 1260 (Fla. 3d DCA 2000) (noting same).

[9]  See *Millennium* 761 So. 2d at 1263 (*quoting Southwest Sunsites, Inc. v. Fed. Trade Comm'n*, 785 F. 2d 1431, 1435 (9th Cir. 1986); *PNR Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003).  *Accord, FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC v. Wilcox*, 926 F.Supp 1091, 1098 (S.D. Fla. 1995).

that the practice produces; and (3) is an injury that consumers themselves could not reasonably have avoided.[10]

To determine whether a representation is deceptive, courts must consider "the impression created by the representation, not its literal truth or falsity."[11]  Advertising claims (express and implied) are deceptive if they have the capacity to convey misleading impressions to consumers even though non-misleading interpretations may be possible.[12]

As detailed above [supra, pages 6-7], Default Defendants' advertisements contained numerous false and misleading representations regarding objectively verifiable and material factual statements, including regarding their companies' size and operating history, [see Complaint at ¶¶23-24, 28-29, and 70a, n18], and the extent of their workers' training, skills and expertise. [Id., at ¶¶1, 11, 69, 70b-e, 73-75, 76-80, 89, 91c, h, 101, 127, 145b,e, f, g, 167g, 168f]].  In reality, the Default Defendants did not employ or control a "nationwide team," but instead, often used other, third-party carriers whose employees were not trained or supervised by the Defendants, and who often carelessly damaged or failed to deliver the consumers' property. [Id., at ¶¶ 1, 11, 69, 70c, e, 73, 76-80, 91c, 101, 145e,f,g].

---

[10]    *See Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1098 (Fla. 3d DCA 2014) (the 1980 Federal Trade Commission Policy Statement's definition of unfair trade practice should be used when interpreting FDUTPA).  *See also Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1364 (11th Cir. 1988) (The FTC's "Policy Statement" is reprinted in H.R.Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 33-40 (1983), and Trade Reg.Rep. (CCH) ¶ 50,421 at 55,947-51.).

[11]    *FTC v. Peoples Credit First, LLC*, 2005 WL 3468588 (M.D. Fla. 2005), *aff'd* 2007 WL 2071712 (11th Cir. 2007) (*citing Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496 (1st Cir. 1989) (*quoting Am. Home Prods. Corp. v. FTC*, 695 F.2d 681, 687 (3d Cir. 1982).

[12]    *See Dept. of Legal Affairs v. Father and Son Moving & Storage*, 643 So.2d 22, 26 (Fla. 4th DCA 1994); *FTC v. Capital Choice Cons. Credit, Inc.*, 02-21050 CIV, 2003 WL 25429612, at *4 (S.D. Fla. June 2, 2003) *aff'd*, 157 Fed. Appx. 248 (11th Cir. 2005); *American Home Products v. FTC*, 695 F.2d at 687; *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir.1976); *Removatron v. FTC*, 884 F.2d at 1497.

Clearly, the net impression created by Default Defendants' advertisements was deceptive, and had a tendency to deceive a consumer acting reasonable under the circumstances.

### 2. Default Defendants' Indirect (Per se) FDUTPA Violations Based on Violations of the Florida Moving Act, and the I.T.C. and FMCSA Regulations

FDUTPA provides that a violation of the Act also includes a violation of "any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Section 501.203(3), Florida Statutes. As detailed in the Complaint, the Default Defendants, acting as part of a common enterprise violated certain, specified provisions of the Florida Moving Act, the I.T.C. and FMCSA Regulations, which violations constitute a "per se" violation of FDUTPA.[13]

### a. Per se FDUTPA Violation Arising From F.M.A. Violations (Count 8)

Section 507.08 of the Florida Moving Act proscribes deceptive and unfair trade practices in connection with intrastate household moves within Florida. Specifically, this section provides that: "Acts, conduct, practices, omissions, failings, misrepresentations, or nondisclosures committed in violation of [the F.M.A.] are deceptive and unfair trade practices under [FDUTPA], and administrative rules adopted in accordance with the act." As detailed above [supra, pages 5-8] and specifically alleged in the Complaint [Complaint at ¶¶68-96, 154-158], in numerous instances, the Default Defendants committed a per se violation of FDUTPA by:

> i.  misrepresenting or deceptively representing: (1) the contract for services, bill of lading, or inventory of household goods for the move estimated, (2) the timeframe or schedule for delivery or storage of the household good estimated, (3) the price, size, nature, extent, qualities, or characteristic of accessorial or moving services offered, (4) the nature or extent of other goods, services, or amenities offered, and/or (5) the shipper's rights, privileges, or benefits, in violation of F.M.A., Section 507.07(3); [*See* Complaint at ¶155]

---

[13]  Under FDUTPA, a practice may be found deceptive without any showing of intent to deceive, and it may be found unfair to consumers without a showing that the offending party intended to cause consumer injury. *See Orkin Exterminating Co. v. FTC*, 849 F. 2d 1354, 1368 (11th Cir. 1988).

    ii.    failing to honor and comply with all provisions of the contract for services or bill of lading regarding the purchaser's rights, benefits, and privileges thereunder, including: (1) improperly increasing the price charged for Moving Services after loading of the consumers' household goods had commenced, (2) failing to relinquish the goods as required despite a proper tender of payment by the consumer, and/or (3) failing to honor the pickup and delivery dates/date ranges that had been agreed upon with the consumer, in violation of F.M.A., Section 507.07(4); [*Id.*, at ¶156]

    iii.    withholding delivery of household goods or otherwise holding goods in storage against the express wishes of the consumer/shipper notwithstanding that payment had been made by the consumer as delineated in the estimate or contract for services, in violation of F.M.A., Section 507.07(5); [*Id.*, at ¶157] and

    iv.    committing numerous acts of fraud, misrepresentation, or failure to disclose a material fact, as detailed above, in violation of F.M.A., Section 507.07(6)(b). [*Id.*]

### b. *Per se FDUTPA Violation Arising From Violations of the I.T.C. and FMCSA Regulations (Count 9)*

The I.T.C. and FMCSA Regulations were intended to promote competitive and efficient transportation services in order to, among other things, "encourage fair competition, and reasonable rates for transportation by motor carriers of property" and "meet the needs of shippers, receivers, passengers, and consumers." (See §13101(a)(2)(A) and (C) of the I.T.C.). Likewise, Title 49 C.F.R. Part 375 (Transportation of Household Goods in Interstate Commerce; Consumer Protection Regulations) sets forth the specific consumer protection regulations governing the transportation of household goods in interstate commerce. [*See* Complaint at ¶ 165].

As specifically detailed above [supra, pages 9-13] and alleged in the Complaint [*Id.*, at ¶¶68-96, 166-170], in numerous instances, the Default Defendants committed a per se FDUTPA violation by:

    i.    Publishing and using advertisements that were materially false and misleading, in violation of Section 375.207 of the Regulations;

    ii.    Providing binding or non-binding estimates to consumer that were materially

false and misleading, including as to the services to be provided and charges to be incurred, in violation of Sections 375.401 and 375.405(b) of the Regulations;

iii.   Requiring consumer to use a different form of payment at the time of delivery than specified when the estimate was prepared, in violation of Section 375.217 of the Regulations;

iv.   Failing to relinquish possession of a shipment of household goods upon the proper payment or proper tender of payment of the amount required on a binding estimate by an individual shipper, in violation of I.T.C. Section 13707(b)(3) and Sections 375.403(7) and 375.703(a) of the Regulations;

v.   Failing to relinquish possession of a shipment of household goods upon the proper payment or proper tender of payment of the amount required on a non-binding estimate by an individual shipper, in violation of I.T.C. Section 13707(b)(3) and Sections 375.405(8), 375.407(a) and 375.703(b) of the Regulations;

vi.   Failing to tender a shipment for delivery to an individual consumer on the agreed delivery date or within the period specified on the bill of lading, in violation of Section 375.603 of the Regulations;

vii.   Failing to provide required notice to the individual shipper when a delay in the pick up or delivery of household goods was apparent, in violation of Section 375.605 of the Regulations; and

viii.   Failing to properly register under the I.T.C. to provide transportation as a motor carrier subject to jurisdiction under subchapter I of chapter 135 of the I.T.C., or service as a broker for transportation subject to jurisdiction under subchapter I of such chapter, in violation of Sections 13901 and 13902 of the I.T.C.

## III.   THE COURT SHOULD RETAIN JURISDICTION TO DETERMINE MONETARY RELIEF TO BE IMPOSED, JOINTLY AND SEVERALLY, AGAINST DEFAULT DEFENDANTS

Default Defendants, as direct participants in a common enterprise, are jointly and severally liable for any monetary relief imposed in this case based on violations of FDUTPA, I.T.C. and/or FMCSA Regulations. [*See supra*, pages 7-9].   Section 501.207(3) of FDUTPA authorizes equitable relief to consumers, including restitution.   In an equitable enforcement action like this

one, the defendants are liable to the extent of their ill-gotten gains, that being the amount of their net revenue (i.e., gross receipts minus refunds). [14]

Civil penalties may also be imposed for willful FDUTPA violations [*see* Sections 501.2075 and 501.2077, Florida Statutes], as well as for violations of the I.T.C. [*See* I.T.C., Section 14711]. In addition, the prevailing party may recover fees and costs from the non-prevailing party in certain circumstances. [*See* Section 501.2105, Florida Statutes; *see also Humane Society of Broward County v. the Florida Humane Society*, 951 So. 2d 966, 969 (Fla. 4th DCA 2007); *Smith v. Bilgin*, 534 So. 2d 852, 854 (Fla. 1st DCA 1998).

In this case, the amount of Default Defendants' liability cannot be determined at this time, until the issue concerning liability of their (non-defaulting) co-defendant (Metzger) and her related entities (Defendants MSA Inc and MSA Services) is ultimately resolved. Accordingly, the Court should retain jurisdiction of this matter for all purposes, including, determining the amount by which the Default Defendants shall be ordered to pay, jointly and severally among themselves and/or their other co-defendants: (1) equitable restitution to injured consumers; (2) civil penalties authorized under the FDUTPA, the I.T.C. and/or the FMCSA Regulations; and/or (3) attorney's fees and costs pursuant to FDUTPA.

---

[14]     *See FTC v Washington Data Resources, Inc.*, 704 F.3d 1323, 1327 (11th Cir. 2013); accord, *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011); *FTC v. Direct Mkg. Concepts Inc.*, 624 F.3d 1, 14-16 (1st Cir. 2010); and *FTC v Febre*, 128 F.3d 530, 536 (7th Cir. 1997).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court enter the proposed

Default Final Judgment As to Liability and Order for Permanent Injunction and Other Relief As

to the Default Defendants.

Dated:  August 16th, 2019                          Respectfully Submitted,

ASHLEY MOODY
ATTORNEY GENERAL


By:      s/ Howard S. Dargan_____
HOWARD S. DARGAN
SENIOR ASSISTANT ATTORNEY GENERAL
Fla. Bar No.:  0494089
Email:  Howard.dargan@myfloridalegal.com

s/ Carol E. A. DeGraffenreidt_____
CAROL E. A. DEGRAFFENREIDT
SENIOR ASSISTANT ATTORNEY GENERAL
Florida Bar # 0642101
        Email: Carol.Degraffenreidt@myfloridalegal.com
        Office of the Attorney General

s/ Hughens Dolisca_____
HUGHENS DOLISCA
ASSISTANT ATTORNEY GENERAL
Florida Bar # 0099744
        Email: Hughens.Dolisca@myfloridalegal.com
        Office of the Attorney General
        Consumer Protection Division
        1515 N. Flagler Drive, Suite 900
        West Palm Beach, FL  33470
        Tel: 561-837-5007 / Fax: 561-837-5109

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of August, 2019, the foregoing document was served on all counsel of record and pro se parties as identified on the attached Service List in the manner as specified below.

 /s/ Howard S. Dargan
Howard S. Dargan, Esq.

**Service List**

| | |
|---|---|
| **Defendant Grace Metzger**<br>c/o MARK F. BOOTH, ESQ.<br>ROGERS, MORRIS & ZIEGLER LLP<br>1401 East Broward Blvd., #300<br>Fort Lauderdale, Florida 33301<br>E-mail: mfbooth@rmzlaw.com<br>Secondary email: Susan@rmzlaw.com<br>    Attorneys for Defendant Metzger<br>        (via email) | **Defendant Maxx Socher (pro se)**<br>    884 Petunia Drive<br>    Plantation, FL 33317<br>    Email:  maxxsocher@gmail.com<br>    (via email and US Mail) |
| **Def. Moving and Storage Accounting Inc**<br>**Attn:  Grace Metzger, Registered Agent**<br>    c/o MARK F. BOOTH, ESQ.<br>    ROGERS, MORRIS & ZIEGLER LLP<br>    (Attorneys for Defendant Grace Metzger)<br>        1401 East Broward Blvd., #300<br>        Fort Lauderdale, Florida 33301<br>        E-mail: mfbooth@rmzlaw.com<br>        Telephone: (954) 462-1431<br>        (via email) | **Def. Moving Services Accounting and Storage Inc**<br>**Attention:  Maxx Socher, Registered Agent**<br>    884 Petunia Drive<br>    Plantation, FL 33317<br>    Email:  maxxsocher@gmail.com<br>    (via email and US Mail) |
| **Def. Moving and Storage Accounting Services Inc**<br>**Attn:  Grace Metzger, Registered Agent**<br>    c/o MARK F. BOOTH, ESQ.<br>    (Attorneys for Defendant Grace Metzger)<br>        1401 East Broward Blvd., #300<br>        Fort Lauderdale, Florida 33301<br>        E-mail: mfbooth@rmzlaw.com<br>        Telephone: (954) 462-1431<br>        (via email) | **Def. Dr. Schlepper Inc**<br>**Attention:  Maxx Socher, Registered Agent**<br>    884 Petunia Drive<br>    Plantation, FL 33317<br>    Email:  maxxsocher@gmail.com<br>    (via email and US Mail) |

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:18-cv-63144-RAR

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA, DEPARTMENT OF
LEGAL AFFAIRS,

      Plaintiff,

              -vs-

MOVING AND STORAGE
ACCOUNTING INC, et al.,

      Defendants.

_____

**[proposed] DEFAULT FINAL JUDGMENT AS TO LIABILITY AND ORDER
FOR PERMANENT INJUNCTION AND OTHER RELIEF AS TO DEFENDANT
MAXX J. SOCHER AND CORPORATE DEFENDANTS MOVING SERVICES
ACCOUNTING AND STORAGE INC, AND DR. SCHLEPPER INC**

THIS MATTER is before the Court on Plaintiff, Office of the Attorney General, State of

Florida, Department of Legal Affairs ("Plaintiff" or "Office of the Attorney General") Motion For

Default Final Judgment as to Liability and Order For Permanent Injunction and Other Relief As to

Defendant Maxx J. Socher and Corporate Defendants, Moving Services Accounting and Storage

Inc, and Dr. Schlepper Inc. ("Motion").

This Court has carefully reviewed Plaintiff's Motion, the entire Court file in this matter,

and being otherwise fully advised in the premises, hereby **GRANTS** Plaintiff's Motion and enters

this Default Final Judgment in favor of the Plaintiff, Office of the Attorney General, State of

Florida, Department of Legal Affairs (1515 N. Flagler Drive, Suite 900, West Palm Beach, FL

33401) and against Defendant Maxx J. Socher (884 Petunia Drive, Plantation, FL 33317; social

security number ending with 0024), and Corporate Defendants Moving Services Accounting and

Exhibit A

Storage Inc and Dr. Schlepper Inc (c/o Maxx J. Socher, Registered Agent, 884 Petunia Drive, Plantation, FL 33317) (collectively referred to as Default Defendants).

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** as follows:

**I.**     <u>**DEFINITIONS**</u>

1.     For purposes of this Judgment, the following terms have the meanings set forth below:

a.     "Accessorial services" means any service performed by a Default Defendant which results in a charge to the shipper and is incidental to the transportation or shipment of household goods, including, but not limited to, valuation coverage; preparation of written inventory; equipment, including dollies, hand trucks, pads, blankets, and straps; storage, packing, unpacking, or crating of articles; hoisting or lowering; waiting time; carrying articles excessive distances to or from the mover's vehicle, which may be cited as "long carry"; overtime loading and unloading; reweighing; disassembly or reassembly; elevator or stair carrying; boxing or servicing of appliances; and furnishing of packing or crating materials. The term also includes services not performed by a Default Defendant but performed by a third party at the request of the shipper or a Default Defendant, if the charges for these services are to be paid to a Default Defendant by the shipper at or before the time of delivery.

b.     "Advertise" means to advise, announce, give notice of, publish, or call attention by use of oral, written, or graphic statement made in a newspaper or other publication or on radio or television, any electronic medium, or contained in any notice, handbill, sign, including signage on vehicle, flyer, catalog or letter, or printed on or contained in any tag or label attached to or accompanying any good.

2

Exhibit A

      c.      "Carrier" or "motor carrier" means any "person" (as defined in Section 13102(18) of the I.T.C. to include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals), who provide motor vehicle transportation for compensation.

      d.      "Complaint" means the complaint filed in this civil action on December 27, 2018 [ECF No. 1].

      e.      "Contract for service" or "bill of lading" means a written document approved by the shipper in writing before the performance of any service which authorizes services from the named mover and lists the services and all costs associated with the household move and accessorial services to be performed.

      f.      "Consumer" means an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination.

      g.      "Default Defendants" mean Defendant Maxx J. Socher ("Socher") and Corporate Defendants, Moving Services Accounting and Storage Inc ("MSAS"), and Dr. Schlepper Inc ("Schlepper").

      h.      "Household goods" or "goods" means personal effects or other personal property commonly found in a home, personal residence, or other dwelling, including, but not limited to, household furniture.

      i.      "Household move" or "household moving services" means the loading of household goods into a vehicle, moving container, or other mode of transportation or shipment; the transportation or shipment of those household goods; and the unloading of those household goods, when the transportation or shipment originates and terminates at one of the following

Exhibit A

ultimate locations, regardless of whether the mover temporarily stores the goods while in route between the originating and terminating locations:

    i.   From one dwelling to another dwelling;

    ii.   From a dwelling to a storehouse or warehouse that is owned or rented by the shipper or the shipper's agent; or

    iii.   From a storehouse or warehouse that is owned or rented by the shipper or the shipper's agent to a dwelling.

    j.     "Impracticable" means conditions that make it impossible, exceedingly difficult or dangerous for a mover to perform pickup or delivery for a household move.

    k.     "Mover" means a person who, for compensation, contracts for or engages in the loading, transportation or shipment, or unloading of household goods as part of a household move.

    l.     "Moving broker" or "broker" means a person who, for compensation, arranges for another person to load, transport or ship, or unload household goods as part of a household move or who, for compensation, refers a shipper to a mover by telephone, postal or electronic mail, Internet website, or other means.

    m.     "Moving Services" means any services relating to the moving, transportation, arranging for the transportation or the physical movement and/or storage of household goods.

    n.     "Physical survey" means an onsite review or inspection of the amount and type of household goods to be moved or transported by the Default Defendant in connection with a household move.

    o.     "Shipper" means a "consumer" who uses the services of a mover to transport or ship household goods as part of a household move either solely within the State of Florida (intrastate moves) or crossing state boundaries or involving more than one state (interstate moves).

Exhibit A

p.      "Storage" means the temporary warehousing of a shipper's goods while under the care, custody, and control of the mover.

q.      "Writing" or "Written" means any physical or electronic document or signature; any "copy" required by this Judgment may also be kept or transmitted electronically.

## II.      FINDINGS

2.      Plaintiff, Office of the Attorney General, is an agency of the State of Florida and an enforcing authority under the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes ("FDUPTA"). (See Complaint, ECF No. 1 ("Compl."), at ¶18).

3.      Plaintiff, Office of the Attorney General is also authorized, pursuant to Section 14711 of Title 49 U.S.C., Subtitle IV, Part B ("Interstate Transportation Code" or "I.T.C."),  to bring a civil action on behalf of the residents of the State of Florida in an appropriate district court of the United States to enforce the consumer protection provisions of the I.T.C. that apply to individual shippers and are related to the delivery and transportation of household goods by a household goods motor carrier subject to jurisdiction under subchapter I of Chapter 135 of the I.T.C. (*Id.*, at ¶19).

4.      Default Defendant Moving Services Accounting and Storage Inc ("MSAS") is a Florida corporation that had its principal place of business registered at 5357 NE 2nd Terr., Fort Lauderdale, Broward County, Florida 33334.  (*Id.*, at ¶27).

5.      Default Defendant Dr. Schlepper Inc ("Schlepper") is a Florida corporation that had its principal place of business registered at 6601 Lyons Rd., L4, Coconut Creek, Broward County, Florida 33073. (*Id.*, at ¶28).

6.      Default Defendant Maxx J. Socher ("Socher") is an individual who resides in Broward County, Florida, is not in the military and is otherwise sui juris. (*Id.*, at ¶32).

Exhibit A

7.      The Plaintiff initiated an investigation into allegations that the Defendants engaged in acts or practices that were misleading, unfair, deceptive, or unconscionable in the marketing, advertising, and performance of household goods moving services. The Plaintiff, Attorney General, determined that this enforcement action serves the public interest, as set forth in Section 501.207(2), Florida Statutes, and that there was reason to believe that the interests of the residents of the State of Florida have been or were being threatened or adversely affected by the Defendants, operated as motor carriers or brokers providing transportation subject to jurisdiction under subchapters I or III of Chapter 135 of the Interstate Transportation Code.  (*Id.*, at ¶¶21-22).

8.      Plaintiff commenced this action by filing its Complaint for injunctive relief, equitable restitution, civil penalties and other statutory relief pursuant to Section 501.204(1) of FDUTPA, and for civil penalties pursuant to Section 14711(a) of the I.T.C. and the regulations promulgated thereunder by the Federal Motor Carrier Safety Administration ("FMCSA"), as contained in Title 49 C.F.R., Chapter III, Subchapter B, Sections 350-399 ("FMCSA Regulations" or "the Regulations"). (Complaint, ECF No. 1).

9.      Default Defendants were properly served with process in this matter pursuant to Rule 5 of the Federal Rules of Civil Procedure ("F.R.C.P."). (ECF No. 14, 15, 16).  Default Defendants thereafter failed to file a responsive pleading as required by Rule 12(a) of the F.R.C.P. The Clerk entered defaults by Order entered May 8, 2019  (ECF No. 22), and on July 30, 2019, this Court entered an Order Requiring Plaintiff to File a Motion Establishing Entitlement to Injunctive Relief concerning the Default Defendants, which Plaintiff has properly filed.

10.     Default Defendants, at all times material hereto, have acted either as interstate "household goods motor carriers," as defined by Section 13102 (12) of the I.T.C. and Section 375.103 of the Regulations, or as intrastate "movers" as defined in Section 507.01(9) of the Florida

Exhibit A

Household Moving Services Act, Chapter 507, Sections 507.01-507.13, Florida Statutes ("Florida Moving Act" or "F.M.A.").  (Compl., at ¶35).

11.     At all times material hereto, the Default Defendants were acting either as "carriers" subject to jurisdiction under subchapter I of Chapter 135 of the I.T.C. and FMCSA Regulations (and were required to follow all FMCSA Regulations as set forth in Title 49 C.F.R., Subtitle B, Chapter III, Subchapter B, Part 375), or intrastate "movers" in connection with the transportation or shipment of household goods originating and terminating in the State of Florida (and required to comply with the Florida Moving Act). (*Id.*, at ¶¶35-37).

12.     Default Defendants, at all times material hereto, solicited "consumers" within the definition of Section 501.203(7) of FDUTPA.   Those persons who used the Default Defendants' Moving Services as part of a household move were "shippers" or "individual shippers" within the meaning of the Florida Moving Act (Section 507.01(12)) or the I.T.C. (Section 13102(13)), as well as being "consumers" under FDUTPA. (*Id.*, at ¶¶38).

13.     Default Defendants, at all material times, provided goods or services as defined within Section 501.203(8), Florida Statutes. (*Id.*, at ¶¶40).

14.     Default Defendants, at all times material hereto, have engaged in a "trade or commerce" within the definition of Section 501.203(8), Florida Statutes. (*Id.*, at ¶¶39).

15.     Default Defendant Socher at all times material hereto, was registered with the FDOS, as president of Default Defendants MSAS and Schlepper.  (*Id.*, at ¶¶32).

16.     At all times material hereto, Default Defendant Socher directly participated in, controlled, and had the authority to control the deceptive acts and practices of Default Defendants MSAS and Schlepper, and he had actual or constructive knowledge of the deceptive acts and practices of Default Defendants MSAS and Schlepper. (*Id.*, at ¶¶34).

Exhibit A

17.     From at least in or about January 2014 to at least in or about May 2016, the Defendants, including Default Defendants MSAS, Schlepper and Socher, advertised themselves as being professional movers staffed by well-trained employees who use the utmost care with shippers' belongings and are scrupulous in preparing and following estimates. (*Id.*, at ¶1).  Instead, these Defendants regularly used unskilled, untrained laborers who often damage or steal property, and routinely provide deceptive, low ball estimates then extort higher fees by holding shippers' property hostage. (*Id.*).

18.     Default Defendant Socher (along with co-defendant Grace Metzger, allegedly) controlled the acts and practices of the Corporate Defendants, including Default Defendants MSAS and Schlepper. (*Id.*, at ¶4).  Default Defendant Socher operated Default Defendants MSAS and Schlepper as part of a common enterprise, conducting their business practices through an interrelated network of companies that had common officers, managers, business functions, employees, or office locations, and that commingled funds. (*Id.*, at ¶¶4, 41-45).

19.     The Default Defendants utilized unfair and deceptive trade practices in connection with advertising, soliciting, providing, offering, selling or distributing services relating to the moving, transportation, arranging for the transportation or the physical movement and/or storage of household goods ("Moving Services") for consumers residing in Florida and elsewhere throughout the United States. (See. e.g., *Id.*, at ¶5-12).  The Default Defendants' deceptive acts and practices included making false and/or misleading representations and promises (expressly and by implication) on the Defendants' website that:

a.  the Defendants' moving company (Full Service Van Lines) had been engaged in the moving industry "[f]or the past 27 years," when in truth and in fact, it had not, and the oldest entity within Defendants' Enterprise was only formed in about September 2011; (*Id.*, at ¶70a);

b.  the Defendants' "team" was made up of "highly trained,  professionals and experts"

Exhibit A

with over a decade of experience in the moving industry, when in truth and in fact, the Defendants often utilized untrained, unskilled and improperly supervised laborers to perform the household goods moving services; (*Id.*, at ¶¶1, 11, 69, 70b, d, e, 73, 75, 79, 101, 145b,e);

c.  the Defendants had a nationwide team of movers ("spread across the country") and therefore could deliver the consumers' property across long distances "…in excellent condition and without any damage," when in truth and in fact, the Defendants had no control over any such "team," but rather often used other, third-party carriers whose employees were not trained or supervised by the Defendants, and who often carelessly damaged or failed to deliver the consumers' property; (*Id.*, at ¶¶ 1, 11, 69, 70c, e, 73, 76-80, 91c, 101, 145e, f, g);

d.  the Defendants had a team of nationwide team of movers and therefore could deliver the consumers' property across long distances "within the specified time period," when in truth and in fact, the Defendants did not control such a nationwide team, and therefore they often unloaded and stored the consumers' goods at an undisclosed storage facility until the goods could be combined with the household goods of other consumers who were moving to the same geographic region or vicinity, thereby resulting in substantial delivery delays or loss to consumers; (*Id.*, at ¶¶ 70c, 74, 89, 91h, 127, 167g, 168f);

e.  the Defendants utilized "professional loading and unloading methods" to ensure that products would be delivered "perfect condition without any scratches or damages," when in truth and in fact, the Defendants and their unskilled laborers often acted in a careless or reckless manner that resulted in substantial, unrecompensed damage to (or loss of) the consumers' household goods;  (*Id.*, at ¶¶1, 11, 68, 69, 70a, b, e, f, j, 72i, 73, 75, 76, 101, 145b, e);

f.  the Defendants were "fully insured" and "licensed" movers, which they implied meant that they had met "the quality standards set by the government," when in truth and in fact, the Defendants continued to operate as a motor carrier even after their operating authority had been revoked by the USDOT; (*Id.*, at ¶¶ 24, 29, 44, 70a, f, 79, 94, 97); and

g.  the Defendants moving services were provided with integrity, reliability and trustworthiness as evidenced by the supposed lack of consumer complaints or negative feedback posted on their website, while failing to disclose that the Defendants had offered to pay some customers to remove unfavorable online reviews or to post favorable ones, and in other instances, caused Enterprise affiliates to post fake online reviews or make favorable comments about them on several websites. (*Id.*, at ¶¶ 1, 68, 70-72).

20.     The Default Defendants engaged in additional deceptive acts and practices, which included providing consumers with artificially low moving quotes then dramatically increasing the

Exhibit A

price after the consumer's goods were loaded onto their trucks. (*Id.*, at ¶¶1, 6, 8, 9, 81-90). In numerous instances, the Default Defendants and their agents continued to hold the consumer's household goods "hostage" until the increased price demanded was paid. (*Id.*, at ¶¶1, 10, 91b, 145d).

### III.    LEGAL CONCLUSIONS/APPLICABLE LAW

21.    This Court has subject matter jurisdiction pursuant to Section 14711(a) of the Interstate Transportation Code. This Court has supplemental jurisdiction over the state of Florida's claims pursuant to 28 U.S.C. Section 1367 and FDUTPA.

22.    Plaintiff is entitled to a default judgment pursuant to Rule 55(b) of the F.R.C.P., against Default Defendants MSAS, Schlepper and Socher, who each: were properly served with a copy of the Complaint in this action; failed to file a responsive pleading in this matter; and have had defaults entered against them by the Clerk of Court pursuant to Rule 55(a), F.R.C.P.

23.    The factual allegations in the Plaintiff's Complaint are taken as true against the Default Defendants. By defaulting, a defendant "admits the plaintiff's well-pleaded allegations of fact, and is barred from contesting on appeal the facts thus established." *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) (quoting *Nishimatsu Const. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.1975)); *Buchanan v. Bowman*, 820 F.2d 359 (11th Cir. 1987) ("liability is well-pled in the complaint, and is therefore established by the entry of default").

24.    The well-pled allegations in Plaintiff's Complaint establish that Default Defendants violated Section 501.204(1) of the FDUTPA, as well as numerous provisions of the Interstate Transportation Code and the FMCSA Regulations promulgated thereunder, in connection with the marketing, offering for sale, and sale of Moving Services.

Exhibit A

25.     The purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."   Section 501.202(2), Florida Statutes.

26.     Additionally, any violation of the I.T.C., the FMCSA Regulations or the Florida Moving Act are a per se violation of FDUTPA pursuant to Section 501.203(3), Florida Statutes, which establishes that a violation of FDUTPA may be based upon, among other things, "… any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices."

27.     Pursuant to Section 501.207(1)(b), Florida Statutes, the Attorney General is authorized to bring "An action to enjoin any person who has violated, is violating, or is otherwise likely to violate, this part." *See Office of the Attorney Gen. v Bilotti*, 267 So.3d 1 (Fla.App. 4 Dist. 2019).  Further, the Attorney General is entitled to seek equitable relief in the form of restitution, in addition to ancillary equitable relief, civil penalties and attorney's fees pursuant to Sections 501.207, 501.2075, and 501.2077, Florida Statutes.

28.     "Permanent injunctive relief is appropriate when 'the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future.'" *FTC v. Lalonde*, 545 Fed. App'x. 825, 841 (11th Cir. 2013).  To that end, "reasonable restrictions upon the future activities of any defendant to impede her or him from engaging in or establishing the same type of endeavor" are permitted by the Act.  Section 501.207(3), Florida Statutes.

29.     FDUTPA authorizes equitable relief to consumers.  Section 501.207(3), Florida Statutes.  All consumers who paid money in response to a deceptive trade practice are entitled to their money back, and there is no need for an individualized inquiry into how each consumer

Exhibit A

reacted to the practice. *Dorestin v. Hollywood Imports, Inc.*, 45 So.3d 819, 831 (Fla. 4th DCA 2010) (*citing State, Office of Atty. Gen., Dept of Legal Affairs v. Wyndham Intern., Inc*. 869 So.2d 592, 598 (Fla. 1st DCA 2004).

30.     "Among the equitable powers of a court is the power to grant restitution and disgorgement." *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996).  In an equitable enforcement action like this one, the defendants are liable to the extent of their ill-gotten gains, that being revenue and not net profit.  *See FTC. v IAB Marketing Associates, LP*, 972 F.Supp.2d 1307, 1313 (S.D. Fla. 2013).  The proper measure of ill-gotten gains in such cases is the amount of net revenue (gross receipts minus refunds), rather than the amount of profit (net revenues minus expenses). *See FTC v Washington Data Resources, Inc.*, 704 F.3d 1323, 1327 (11th Cir. 2013); accord, *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011); *FTC v. Direct Mkg. Concepts Inc.*, 624 F.3d 1, 14-16 (1st Cir. 2010); and *FTC v Febre*, 128 F.3d 530, 536 (7th Cir. 1997).

31.     FDUTPA provides that any person, firm, corporation, association, or entity, or any agent or employee of the foregoing, who is willfully using, or has willfully used, a method, act, or practice declared unlawful under FDUTPA … is liable for a civil penalty. Section 501.2075, Florida Statutes.  Willful violations occur when the person knew or should have known that his or her conduct was unfair, deceptive or prohibited by rule. *Id.*

32.     Civil penalties in the amount of up to Ten Thousand Dollars ($10,000.00) per violation may be assessed against any person who has willfully engaged in an unfair or deceptive act or practice, pursuant to Section 501.2075, Florida Statutes, and up to Fifteen Thousand Dollars ($15,000), against any person willfully using an act or practice that violates FDUTPA which victimizes a senior citizen, or a person who has a disability, or is directed at a military

Exhibit A

servicemember or the spouse or dependent child of a military servicemember, pursuant to Section 501.2077, Florida Statutes.  Each instance in which a deceptive representation is disseminated constitutes a violation.  *U.S. v. Reader's Digest Ass'n, Inc.*, 662 F. 2d 955, 966 (3d Cir. 1981).

33.     Section 501.2105, Florida Statutes, provides that the prevailing party may recover fees and costs from the non-prevailing party in certain circumstances. *Humane Society of Broward County v. the Florida Humane Society*, 951 So. 2d 966, 969 (Fla. 4th DCA 2007); Smith v. Bilgin, 534 So. 2d 852, 854 (Fla. 1st DCA 1998).

34.     Likewise, Section 14711 of the Interstate Transportation Code enables the Office of the Attorney General to seek civil penalties authorized under the I.T.C. whenever the Plaintiff has reason to believe that the interests of the residents of the State of Florida have been or are being threatened or adversely affected by a carrier providing transportation.

35.     Corporate defendants are jointly and severally liable when, considering "the pattern and framework of the whole enterprise," there is evidence of a common enterprise between them. *Del. Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964); *see also CFTC v. Wall Street Underground*, 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003), *citing Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1175 (1st Cir. 1973) ("Where one or more corporate entities operate in a common enterprise, each may be held liable for the deceptive acts and practices of the other").

36.     To determine whether a common enterprise exists, courts look to a variety of factors, including:  common control; the sharing of office space and officers; whether business is transacted through a maze of interrelated companies; the commingling of corporate funds; the failure to maintain separation of companies; the sharing of advertising and marketing; and evidence which reveals that no real distinction exists between the corporate defendants. *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012); *FTC v. Wolf*, No. 94-8119, 1996

13

U.S. Dist. LEXIS 1760, *22-23 (S.D. Fla. Jan. 31, 1996) (internal citations omitted); *Nat'l Urological Group, LLC*, 645 F. Supp. 2d at 1182; *FTC v. US. Oil & Gas Corp.*, 1987 U.S. Dist. LEXIS 16137, *58-63 (S.D. Fla. July 10, 1987); *FTC v. Direct Benefits Group, LLC*, 2013 U.S. Dist. LEXIS 100593, *55-56 (M.D. Fla. July 18, 2013).

37.     The Court now finds that the Plaintiff's Complaint contains well-pled allegations that are sufficient to support the entry of this Default Final Judgment against the Default Defendants for violating Section 501.204(1) of the FDUTPA, and the provisions of the I.T.C. and FMCSA Regulations alleged in the Complaint, in connection with their marketing, offering for sale, and sale of Moving Services.

38.     The Court further finds that Default Defendant Socher operated Default Defendants MSAS and Schlepper as part of a common enterprise, while engaging in deceptive acts and practices in violation of the I.T.C., the FMCSA Regulations and the FDUTPA.  The Default Defendants conducted their business practices through an interrelated network of companies that had common officers, managers, business functions, employees, or office locations, and that commingled funds.

39.     The Court further finds that the Default Defendants, while operating as household goods motor carriers through a common enterprise, have violated Title 49 C.F.R. Part 375 (§375.207) by engaged in advertising, as defined in Section 375.103 of the Regulations, including on its Internet web site, which advertising included false, dishonest and misleading representations that Defendants' Moving Services were performed by "highly trained," "professional," of "expert" movers, when in truth and in fact, and as the Default Defendants well knew, in numerous instances their Moving Services were performed with unskilled and untrained laborers who regularly damaged, destroyed or stole the consumers' property.

Exhibit A

40.     The Court further finds that during various times material hereto, Default Defendants, operating as household goods motor carriers through a common enterprise, have violated Title 49 U.S.C. §14104(b) and C.F.R. Part 375 (§375.401)) by executing orders for service for a shipment of household goods for individual shippers without providing the shipper(s) with a proper, written estimate in compliance with Section 14104(b)(1)(C) of the I.T.C., and Section 375.401 of the Regulations, including providing estimates to shippers that:

    a.    were not made in a writing that was dated, signed by the Default Defendants' agents and the individual shipper, and copied and supplied to the individual shipper;

    b.    did not include the total amount for all charges for the transportation and related (accessorial) services to be provided;

    c.    did not properly indicate whether it was a binding or a non-binding estimate;

    d.    were not made based on a physical survey of the household goods to be transported and without a valid exemption from the requirement that such estimates be based on said physical survey;

    e.    did not contain a reasonably accurate estimate of the approximate costs the individual shipper should expect to pay for the transportation and services of such shipments; and/or

    f.    were amended by the Default Defendants or their agents after loading the shipment.

41.     The Court further finds that during various times material hereto, Default Defendants, operating as household goods motor carriers through a common enterprise, have violated Title 49 U.S.C. §13707(b)(3) and C.F.R. Part 375 (§§375.403(7) and 375.703(a)) by, in numerous instances, failing to relinquish possession of a shipment of household goods to an individual shipper who offered to pay (and in some instances had paid) the binding estimate amount plus applicable charges for additional services requested by the shipper after the bill of lading has been issued and applicable charges for "impracticable operations" totaling up to 15 percent of all other charges due at delivery.

15

Exhibit A

42.     The Court further finds that during various times material hereto, Default Defendants, operating as household goods motor carriers through a common enterprise, have violated Title 49 U.S.C. §13707(b)(3) and C.F.R. Part 375 (§§375.405(8), 375.407(a) and 375.703(b)) by, in numerous instances, failing to relinquish possession of a shipment of household goods upon the individual shipper's offer to pay 110 percent of the non-binding estimate amount (plus charges for any additional services requested by the shipper after the bill of lading has been issued and charges, if applicable, for "impracticable operations" not to exceed 15 percent of all other charges due at delivery).

43.     The Court further finds that during various times material hereto, Default Defendants, operating as household goods motor carriers through a common enterprise, have violated Title 49 C.F.R. Part 375 (§§375.603 and 375.605) by:

    a.    failing to tender a shipment of household goods for delivery for an individual consumer on the agreed delivery date or within the period specified on the bill of lading;

    b.    failing to timely pick up a shipment of household goods from an individual shipper on the agreed delivery date or within the period specified in the order for service; and/or

    c.    failing to promptly notify the individual shipper as soon as a delay in the pickup or delivery of their shipment had become apparent, and/or advising the individual shipper of the dates or periods when they expected to be able to pick up and/or deliver the shipment.

44.     The Court further finds that during the periods from about June 1, 2015 to July 20, 2015 and about October 5, 2015 to about February 2016, the Default Defendants, operating as household goods motor carriers through a common enterprise, have violated Title 49 U.S.C. §§13901 and 13902 by providing transportation of household goods subject to jurisdiction under subchapter I of chapter 135 of the I.T.C., or broker services for such transportation to consumers/shippers in Florida and elsewhere without being properly registered with the USDOT

Exhibit A

as a motor carrier or broker under chapter 139 of the I.T.C.

45.     The Court further finds that during various times material hereto, Default Defendants, operating as household goods motor carriers through a common enterprise, have directly violated Section 501.204(1) of the FDUTPA, by using deceptive and unfair acts and practices in the advertising, marketing, soliciting, selling and/or providing of Moving Services to consumers in Florida and elsewhere, including:

    a.    misrepresenting to consumers, in Default Defendants' advertising materials and other solicitations, expressly and by implication, the true nature, quality or extent of Moving Services to be provided by the Default Defendants and their agents;

    b.    misrepresenting to consumers, in Default Defendants' advertising materials and other solicitations, expressly and by implication, that Defendants' Moving Services would be provided by "highly trained," "professional" or "expert" movers who would transport the consumers' household goods with the utmost care;

    c.    using "bait-and-switch" tactics by providing consumers with one moving quote prior to collecting the consumer's household goods and thereafter materially increasing the price for the mover after the Default Defendants' agents have arrived at the consumer's dwelling and began loading the consumers' household goods onto the Default Defendants' moving trucks;

    d.    holding consumers' household goods "hostage" after all or a portion of the consumer's household goods have been loaded onto moving trucks, by refusing thereafter to release the household goods unless consumers paid additional material amounts above their prior estimates to the Default Defendants' agents (often required to be paid only in cash);

    e.    failing to disclose that Default Defendants' Moving Services are regularly performed by untrained and unskilled laborers who act in a careless and/or reckless manner that often results in substantial, unrecompensed damage to (or loss of) the consumers' household goods; and

    f.    failing to disclose that Default Defendants' Moving Services are regularly performed by inept, corrupt and/or dishonest agents who often damage, lose or misappropriate consumers' valuable property during the move;

46.     The Court further finds that during various times material hereto, Default Defendants, operating as household goods motor carriers through a common enterprise, have committed indirect (per se) violations of Section 501.204(1) of the FDUTPA, by violating "any

Exhibit A

law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or

unfair, deceptive, or unconscionable acts or practices", to wit:

    a.  violating one or more provisions of the Florida Moving Act, Chapter 507, Sections 507.01-507.13, Florida Statutes, including:

        i.  violating Section 507.07(3) of the F.M.A., by misrepresenting or deceptively representing: (1) The contract for services, bill of lading, or inventory of household goods for the move estimated; (2) The timeframe or schedule for delivery or storage of the household good estimated; (3) The price, size, nature, extent, qualities, or characteristic of accessorial or moving services offered; (4) The nature or extent of other goods, services, or amenities offered; or (5) A shipper's rights, privileges, or benefits;

        ii.  violating Section 507.07(4) of the F.M.A., by failing to honor and comply with all provisions of the contract for services or bill of lading regarding the purchaser's rights, benefits, and privileges thereunder, including: (1) improperly increasing the price charged for the purported Moving Services provided after loading of the consumers' household goods had commenced; (2) failing to relinquish the goods as required despite a proper tender of payment by the consumer; or (3) failing to honor the pickup and delivery dates/date ranges that had been agreed upon with the consumer;

        iii.  violating Section 507.07(5) of the F.M.A., by withholding delivery of household goods or otherwise holding goods in storage against the express wishes of the shipper notwithstanding that payment had been made by the consumer as delineated in the estimate or contract for services;

        iv.  violating Section 507.07(6)(b) of the F.M.A., by committing numerous acts of fraud, misrepresentation, or failure to disclose a material fact; and

    b.  violating one or more provisions of the Interstate Transportation Code and the FMCSA Regulations, including:

        i.  Publishing and using advertisements that were materially false and misleading, in violation of Section 375.207 of the Regulations;

        ii.  Providing binding or non-binding estimates to consumer that were materially false and misleading, including as to the services to be provided and charges to be incurred, in violation of Sections 375.401 or 375.405(b)) of the Regulations;

        iii.  Failing to relinquish possession of a shipment of household goods upon the proper payment or proper tender of payment of the amount required on a binding or non-binding estimate by an individual shipper, in violation of

Exhibit A

I.T.C. Section 13707(b)(3) and/or Sections 375.403(7) and 375.703(a) of the Regulations;

iv.   Failing to tender a shipment for delivery to an individual consumer on the agreed delivery date or within the period specified on the bill of lading, in violation of Section 375.603 of the Regulations;

v.   Failing to provide required notice to the individual shipper when a delay in the pick up or delivery of household goods was apparent, in violation of Section 375.605 of the Regulations; and

vi.   Failing to properly register under the I.T.C. to provide transportation as a motor carrier subject to jurisdiction under subchapter I of chapter 135 of the I.T.C., or service as a broker for transportation subject to jurisdiction under subchapter I of such chapter, in violation of I.T.C. Sections §§13901 and 13902).

47.   The Court further finds that this action was brought in the public interest and that there is a need for injunctive relief in this case.  In that regard, the Court further finds that unless Default Defendants are permanently enjoined from engaging further in the unfair and deceptive acts and practices alleged in the Complaint, in direct and indirect violation of FDUTPA, their continued activities will result in irreparable injury to the public for which there is no adequate remedy at law.

## I.   ORDER

### A.   INJUNCTIVE TERMS

48.   The Court hereby immediately and permanently **ENJOINS** Default Defendants, MSAS, Schlepper and Socher, and any person or entity acting on their behalf, as well as those persons in active concert or participation with them who receive actual notice of this Default Final Judgment, directly or indirectly, from:

a.   Violating the provisions of FDUTPA by making false or misleading representations to consumers in the conduct of any trade or commerce, including deceptively advertising, soliciting, providing, offering, selling or distributing any goods or services, including but not limited to Moving Services;

Exhibit A

b. Participating, directly or indirectly, in the advertising, soliciting, marketing, promoting or offering for sale to any consumers, or assisting others in the advertising, solicitation, marketing, promotion, or offering for sale to any consumers, of any Moving Services, over the Internet or otherwise;

c. Participating, directly or indirectly, in the sale of any Moving Services to any consumer in connection with any (intrastate) move solely within the State of Florida;

d. Owning, controlling, having the authority to control, managing, participating in, assisting, being employed by or associated with, or receiving any benefit, either directly or indirectly, from the acts and practices of any business, organization, entity, or individual that offers, sells, engages in, renders or otherwise provides, directly or indirectly, a service or good related to Moving Services to any consumer in connection with any (intrastate) move solely within the State of Florida;

e. Charging, collecting, attempting to collect, or accepting any payments of any form, directly or indirectly, for any Moving Services from any consumer in connection with any (intrastate) move solely within the State of Florida;

f. Engaging in any act or practice likely to mislead consumers regarding any goods or services being offered, sold or provided, including making misrepresentations or deceptive representations (directly or indirectly, expressly or by implication) regarding the price, nature, extent, qualities, timing or characteristics of the goods or services being offered or provided;

g. Committing any acts or practices that constitute a per se violation of FDUTPA, based upon any violation of the Florida Moving Act, Chapter 507, Sections 507.01-507.13, Florida Statutes, including, but not limited to:

   i. Violating Section 507.07(3) of the F.M.A. (misrepresentations or deceptive representations);

   ii. Violating Section 507.07(4) of the F.M.A. (failing to honor contract for services or bill of lading);

   iii. Violating Section 507.07(5) of the F.M.A. (withholding delivery of household goods); and

   iv. Violating Section 507.07(6)(b) of the F.M.A. (fraud, misrepresentation or failure to disclose material facts);

h. Committing any acts or practices that constitute a per se violation of FDUTPA, based upon any violations of the I.T.C. and/or FMCSA Regulations, , including, but not limited to:

20

Exhibit A

    i.    Violating Section 375.207 of the Regulations (false and misleading advertising);

    ii.    Violating Section 375.401 of the Regulations (written estimates);

    iii.    Violating Section 13707(b)(3) of the I.T.C. and Sections 375.403(7) and 375.703(a) of the Regulations (release of goods on binding estimates);

    iv.    Violating Section 13707(b)(3) of the I.T.C. and Sections 375.403(7) and 375.703(a) of the Regulations (release of goods on non-binding estimates);

    v.    Violating Section 375.603 of the Regulations (failure to tender shipment);

    vi.    Violating Section 375.405 of the Regulations (failure to notify); and

    vii.    Violating Sections 13901 and/or 13902(a)(6) of the I.T.C. (registration).

49.    The Court further immediately and permanently **ENJOINS** Default Defendants, MSAS, Schlepper and Socher, and any person or entity acting on their behalf, as well as those persons in active concert or participation with them who receive actual notice of this Default Final Judgment, directly or indirectly, in connection with the advertising, marketing, promoting, offering for sale, or selling of any product, goods, service, plan, or program, from misrepresenting, or assisting others in misrepresenting, directly or indirectly, expressly or by implication:

    a.    any material aspect of the nature or terms of any refund, cancellation, exchange, or repurchase policy, including the likelihood of a consumer obtaining a full or partial refund, or the circumstances in which a full or partial refund will be granted to the consumer;

    b.    that any person is affiliated with, endorsed or approved by, or otherwise connected to any other person, government entity, association or program;

    c.    the nature, training, expertise, position or job title of any person who provides, or will provide, any goods or services to consumers;

    d.    that reviews of any product, service, plan, or program are independent reviews reflecting the views of ordinary consumers;

    e.    that any person providing a testimonial has purchased, received, or used the product, service, plan, or program;

21

Exhibit A

f. that the experience represented in a testimonial of the product, service, plan, or program represents the person's actual experience resulting from the use of the product, service, plan, or program under the circumstances depicted in the advertisement; and

g. any other fact material to consumers concerning any good or service, such as: the total costs; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics.

## B.   RETENTION OF JURISDICTION

50.   **IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this case

for all purposes, including, but not limited to:

a. determining the amount by which the Default Defendants shall be ordered to pay, jointly and severally among themselves and/or their other co-defendants:  (1) equitable restitution to injured consumers; (2) civil penalties authorized under the FDUTPA, the I.T.C. and/or the FMCSA Regulations;  and/or (3) attorney's fees and costs pursuant to FDUTPA;

b. entering any further Orders modifying or amending this Default Final Judgment to incorporate such amounts of equitable restitution, civil penalties, attorney's fees and/or costs that this Court determines the Default Defendants should be ordered to pay, jointly and severally among themselves and/or their other co-defendants; and

c. entering any further Orders for such other relief as may be necessary or appropriate: (1) for ensuring compliance with this Default Final Judgment, including through civil and/or criminal contempt proceedings; (2) for the modification, construction, or implementation of the injunctive provisions of this Order; and/or (3) for the enforcement and punishment of violations of any provisions hereof.

## C.   FUTURE VIOLATIONS

51.   **IT IS FURTHER ORDERED** that any failure to comply with the terms and

conditions of this Default Final Judgment is prima facie evidence of a FDUTPA violation, and will

subject Default Defendants to any and all additional civil penalties and sanctions authorized by

law, including attorney's fees and costs incurred in enforcing this Default Final Judgment.  Any

sanction or payment provided by this Default Final Judgment does not preclude the Office of the

Exhibit A

Attorney General from pursuing any other action, relief, or sanction available to the Plaintiff for any act which, independent of this Default Final Judgment, would constitute a violation of the laws of Florida.

### D.   COMPLIANCE MONITORING AND REPORTING REQUIREMENTS

52.   **IT IS FURTHER ORDERED** that beginning from the Effective Date of this Default Final Judgment, all of the Default Defendant's records must be retained for a minimum of three (3) years. The Default Defendants shall maintain and make available to Plaintiff's representative(s), upon any reasonable written request, all books, records and other documents, except privileged documents, in the format in which they exist, which reflect the implementation of the terms of this Default Final Judgment and compliance with its terms. Any such records requested by the Office of the Attorney General shall be made available for inspection within ten (10) business days of the Default Defendant's receipt of the request. The Default Defendants shall honor any request from the Office of the Attorney General to make such records available without legal process.

53.   For a period of two (2) years from the Effective Date, Default Defendants shall submit to the Office of the Attorney General an affidavit attesting to their compliance with the injunctive provisions in this Judgment every six (6) months.

54.   For a period of two (2) years from the Effective Date, the Default Defendant Socher shall notify the Attorney General of the following within ten (10) days of the occurrence of:

 a.   Any changes in a Default Defendant's residence, principal place of business, mailing address, and/or telephone number;

 b.   Any changes in a Default Defendant's employment status (including self-employment), and any change in Default Defendant's ownership in any business entity. Such notice shall include the name and address of each business that Default Defendant is affiliated with, employed by, creates or forms, or performs services for; a detailed description of the nature of the business; and a detailed description

23

of Default Defendant's duties and responsibilities in connection with the business or employment; and

c.   Any changes in a Default Defendant's name or use of any aliases or fictitious names.

55.   The Default Defendants shall notify the Office of the Attorney General of the filing of a bankruptcy petition by any Default Defendant within fifteen (15) days of filing.

56.   Within seven (7) days of the Effective Date, the Default Defendants shall:

a.   Designate at least one telephone number and email, physical, and postal address as points of contact, which the Office of the Attorney General may use to communicate with the Default Defendants;

b.   Identify all businesses the Default Defendants owns, or directly or indirectly control, by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

c.   Describe the activities of each such business, including the products and services offered, and the means of advertising, marketing, and sales;

d.   Describe in detail the Default Defendants' current employment or business activities, whether as an employee, independent contractor, owner, manager, consultant or partner, and describe the nature of such employment or business activity, including Default Defendant Socher's title, role, responsibilities, participation, authority, control, and ownership.

57.   For two (2) years from the Effective Date, the Default Defendants must report any change in the information required to be submitted under Paragraph 53 at least 30 days before the change or as soon as practicable after learning about the change, whichever is sooner.

58.   Unless otherwise directed by the Office of the Attorney General's representatives, all submissions to the State of Florida Office of the Attorney General must be sent to Howard S. Dargan, Assistant Attorney General, Consumer Protection Division, Office of the Attorney General State of Florida, 1515 N. Flagler Drive, Suite 900, West Palm Beach, Florida 33401.

59.   For matters concerning this Default Final Judgment, the Plaintiff is authorized to communicate directly with each Defaulting Defendant, until notified in writing that they are

Exhibit A

represented by counsel.

60.    **IT IS FURTHER ORDERED** that the Office of the Attorney General is authorized to monitor any Default Defendant's compliance with this Default Final Judgment, without further leave of the Court, by all lawful means, including but not limited to the use of representatives posing as consumers or other individuals or entities to the Default Defendants, any of the Default Defendant's employees, or any other entity managed or controlled in whole or in part by any Default Defendant, without the necessity of identification or prior notice.

61.    **IT IS FURTHER ORDERED** that, the Office of the Attorney General is explicitly authorized to obtain credit reports from the consumer reporting agencies (i.e., EXPERIAN, EQUIFAX and TRANSUNION, including banking information from Microbilt or other asset searching entities) concerning the Default Defendants and to share this authorization with any entity that may require it.  Upon written request from a representative of the Plaintiff, any consumer reporting agency must furnish consumer reports concerning a Default Defendant, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

62.    **IT IS FURTHER ORDERED** that the Default Defendants shall not effect any change in the form of doing business or the organizational identity of any of the existing business entities or create any new business entities as a method of avoiding the obligations and terms and conditions set forth in this Default Final Judgment.

### E.    EFFECTIVE DATE

63.    The "Effective Date" of this Default Final Judgment is the date upon which the Default Final Judgment is entered by the Court.

### F.    GENERAL AND ADMINISTRATIVE PROVISIONS

64.    If any provision of this Default Final Judgment is to any extent unenforceable,

Exhibit A

invalid, or illegal, such term shall be excluded to the extent of such invalidity or unenforceability; all other terms hereof shall remain in full force and effect; and, to the extent permitted and possible, the invalid or unenforceable term shall be deemed replaced by a term that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term.

65.    **IT IS FURTHER ORDERED** that any post-judgment deposition of the Default Defendants that may be held shall be had in Broward County, Florida, unless the Parties agree otherwise.

## G.    ORDER ACKNOWLEDGEMENTS

66.    **IT IS FURTHER ORDERED** that Default Defendants, within seven (7) days after receiving a copy of this Default Final Judgment (including via email or facsimile transmission), must submit to Plaintiff an acknowledgment of receipt of this Order, sworn under penalty of perjury.

**SO ORDERED**, this _____ day of _____, 2019, at _____.m.

_____
**RODOLFO RUIZ**
**UNITED STATES DISTRICT JUDGE**

26

Exhibit A

# EXHIBIT B

Department of Defense Manpower Data Center



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

SSN:            XXX-XX-0024
Birth Date:     Dec-XX-1988
Last Name:      SOCHER
First Name:     MAXX
Middle Name:
Status As Of:   Aug-02-2019
Certificate ID: XTHMZDP7N4N5M3W

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard).  This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

Michael V. Sorrento, Director
Department of Defense - Manpower Data Center
400 Gigling Rd.
Seaside, CA  93955

Exhibit B

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. ? 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service. Service contact information can be found on the SCRA website's FAQ page (Q33) via this URL: https://scra.dmdc.osd.mil/faq.xhtml#Q33. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. ? 521(c).

This response reflects the following information:  (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days  preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC ? 101(d) (1). Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available. In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC ? 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds. All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support. This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs). Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate. SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC ? 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction. The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING:  This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester. Providing erroneous information will cause an erroneous certificate to be provided.

Exhibit B